UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TAMMY COOPER, CROSS OVER
THERAPY, LLC AND KENDALL
"KEN" BROWN

CIVIL ACTION

VERSUS

NO. 16-259-EWD (CONSENT)

PRIMARY CARE SOLUTIONS, INC.,
WILLIAM BULLOCK, MONICA
LEWIS, AND KIM ROUNDTREE

## RULING AND ORDER ON MOTION TO DISMISS UNDER FRCP 12(B)(2) AND 12(B)(6)

Before the court is a Motion to Dismiss Under FRCP Rule 12(b)(2) and 12(b)(6) (the "Motion to Dismiss"), filed by defendants, Primary Care Solutions, Inc. ("PCS"), William Bullock ("Bullock"), Monica Lewis ("Lewis"), and Kim Roundtree ("Roundtree") (collectively PCS, Bullock, Lewis and Roundtree are "Defendants" and Bullock, Lewis, and Roundtree are the "Individual Defendants").[1]  The Motion is opposed.[2]  For the reasons that follow, **IT IS HEREBY ORDERED** that the Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.

## I.        Factual and Procedural Background

Tammy Cooper ("Cooper"), Cross Over Therapy, LLC ("COT"), and Kendall Brown ("Brown") (collectively Cooper, COT and Brown are "Plaintiffs"), filed their original Complaint on April 22, 2016.  The case arises from contractual relationships between Cooper and PCS and Brown and PCS.  Specifically, in April 2014, Cooper executed a Site Director Consultant Agreement with PCS whereby Cooper was to serve as a Site Director in Donaldsonville,

---

[1] R. Doc. 33.

[2] R. Doc. 35.

Louisiana.[3]   Brown executed a Site Director Consultant Agreement with PCS in July 2014, whereby he was to serve as a Site Director in St. Francisville, Louisiana.[4]   Plaintiffs allege that PCS, "through its alter egos and corporate officers, William Bullock, Monica Lewis and Kim Roundtree, devised an unethical, oppressive, unscrupulous scheme that offends established public policy that amounts to fraud, deceit, and misrepresentation" by soliciting Cooper and Brown to invest in "a purported franchise investment scheme without following federal or Louisiana franchising or security laws"[5] and that PCS ultimately sold the offices established by Cooper and Brown to Seaside HCBS, LLC ("Seaside") without paying Plaintiffs a percentage of the profits derived from the sale.[6]

On March 21, 2017, Defendants' motion to dismiss the original Complaint was granted in part and denied in part.[7]   In that ruling, Plaintiffs' claims against the Individual Defendants were dismissed for lack of personal jurisdiction.[8]   Additionally, Plaintiffs' claims against the Defendants under the Louisiana Unfair Trade Practices Act ("LUTPA"), the Federal Trade Commission Act, Louisiana Securities Law, and the Fair Labor Standards Act ("FLSA") were dismissed, and Plaintiffs' claims for breach of contract, interference with contract, and conversion against the

---

[3] R. Doc. 14-1 at 7-8.  Plaintiffs allege that in February 2015 PCS entered into a second contract with COT to be the site director of the Donaldsonville office.  R. Doc. 27, ¶ 34.  Per Cooper's affidavit, COT is a limited liability company owned by Cooper.  R. Doc. 14-1, ¶ 20 ("Without cancelling the contract originally entered into with me, in February 2015, while I was in Louisiana, Primary Care Solutions, Inc. entered into a second contract with me through an LLC owned by me, Cross Over Therapy, LLC, to be the site director and backdated the contract to be effective to May 1, 2014.").

[4] R. Doc. 14-3 at 5-6.

[5] R. Doc. 27, ¶ 11.

[6] R. Doc. 27, ¶ 17.  Throughout their First Supplemental and Amending Complaint, Plaintiffs also allege that the contracts with PCS contained invalid non-competition clauses.  However, Plaintiffs do not allege that Defendants have sought to enforce the allegedly invalid clauses, and no determination regarding the enforceability of the clauses has been moved for by either party.

[7] R. Doc. 26.

[8] R. Doc. 26, pp. 3-13.

Individual Defendants were dismissed.[9]   Plaintiffs were granted leave to file an amended complaint, and on April 11, 2017, Plaintiffs timely filed a First Supplemental and Amending Complaint (the "Amending Complaint") to address, *inter alia*, the substantive deficiencies noted in the court's March 21, 2107 ruling.[10]

On May 10, 2017, Defendants filed the instant Motion to Dismiss.[11]   The Motion to Dismiss seeks dismissal of Plaintiffs' claims against the Individual Defendants for lack of personal jurisdiction, and also seeks dismissal of Plaintiffs' claims against all Defendants under LUTPA, FLSA, for conversion, and for unjust enrichment.   Additionally, the Motion to Dismiss seeks dismissal of Plaintiffs' claims for breach of contract and interference with contract against the Individual Defendants.

## II.     Law and Analysis

### A.  Personal Jurisdiction Over the Individual Defendants

Fed. R. Civ. P. 12(b)(2) authorizes dismissal of an action where the court lacks personal jurisdiction over a defendant.   "Where a defendant challenges personal jurisdiction, the party seeking to invoke the power of the court bears the burden of proving that jurisdiction exists." *Luv N' Care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 469 (5th Cir. 2006) (citing *Wyatt v. Laplan*, 686 F.2d 276, 280 (5th Cir. 1982)).   When, as in this case, a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, the plaintiff need only make a *prima facie* showing of personal jurisdiction. *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (quoting *Buillion v. Gillepsie*, 895 F.2d 213, 217 (5th Cir. 1990) (citations omitted)).   "Moreover, on a motion to dismiss for lack of jurisdiction, uncontroverted

---

[9] R. Doc. 26, pp. 13-32.

[10] R. Doc. 27.

[11] R. Doc. 33.

allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor for purposes of determining whether a *prima facie* case for personal jurisdiction exists." *Id*. ("Proof by preponderance of the evidence is not required."). However, in assessing whether the plaintiff has presented a *prima facie* case of personal jurisdiction, the court "will not 'credit conclusory allegations, even if uncontroverted.'" *Sealed Appellant 1 v. Sealed Appellee 1*, 625 Fed. Appx. 628, 631 (5th Cir. 2015) (quoting *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 869 (5th Cir. 2001)). The court may consider "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985)). "[A]ll uncontroverted allegations are taken as true and fact conflicts are resolved in the plaintiff's favor." *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed. Appx. 775, 792 (5th Cir. 2007).

"A nonresident defendant's contacts may support either specific or general jurisdiction." *Service Steel Warehouse, Co. L.P. v. Eakin*, Civil Action No. 10-151, 2011 WL 3439132, at * 2 (M.D. La. Aug. 5, 2011). "Specific jurisdiction over a nonresident defendant is present where the 'suit arises out of or [is] related to the defendant's contacts with the forum....'" *Id*. (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *Clemens v. McNamee*, 615 F.3d 374, 378–379 (5th Cir. 2010) (stating that "[s]pecific jurisdiction ... requires a sufficient nexus between the nonresident's contacts with the forum and the cause of action")). "Alternatively, general jurisdiction exists 'when a nonresident defendant's contacts with the forum

are substantial, continuous, and systematic.'" *Id.* (citing *Johnston v. Multidata Systems Intern. Corp.*, 523 F.3d 602, 609 (5th Cir. 2008)).[12]

The Fifth Circuit has set forth a three-step analysis for specific personal jurisdiction, whereby the court considers:

> (1) whether the defendant has minimum contacts with the forum state, *i.e.*, whether it purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable.

*Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 378 (5th Cir. 2002) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "A defendant has minimum contacts with a forum state if 'the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Burger King*, 471 U.S. at 474. "Even where a defendant has no physical presence in the forum state, a single purposeful contact is sufficient to confer personal jurisdiction if the cause of action arises from the contact." *Nuovo Pignone*, 310 F.3d at 379. "Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Id.* (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir.1999)).

In their Amending Complaint,[13] Plaintiffs allege that William Bullock is the president of PCS, Monica Lewis is a "director, consultant and managing partner of PCS," and Kim Roundtree

---

[12] Because the court finds that there is specific personal jurisdiction over the Individual Defendants, it is not necessary to analyze whether there is also general personal jurisdiction.

[13] Plaintiffs' original complaint did not allege who was present at meetings referenced in the pleading, nor when or where such meetings took place. The original complaint failed to specify when in 2014 the Plaintiffs were approached, by whom and where, and did not provide any specifics regarding meetings between Plaintiffs and the Individual Defendants. *See*, R. Doc. 26, p. 6 n. 12-14. In contrast, the Amending Complaint is more specific with respect to meetings between the Plaintiffs and the Individual Defendants.

is a director of PCS.[14]   Plaintiffs allege the Individual Defendants and PCS recruited them by

"offering them an opportunity to invest in Primary Care Solutions, Inc. and start their own satellite

agency offices that promised to pay 40% of the profits monthly after a $25,000 sweat equity

investment."[15]   Plaintiffs assert that "[i]n approximately March or April 2014, during a

presentation meeting at the Baton Rouge office of PCS, Kendall 'Ken' Brown and others were told

by William Bullock, Kim Roundtree, and Monica Lewis that the company had decided to franchise

Primary Care Solutions"[16] and that "PCS through its alter ego, President, William Bullock and

alter egos directors, Monica Lewis and Kim Roundtree came to Baton Rouge Louisiana in March

and April 2014 and convinced Tammy Cooper an employee of PCS in the Baton Rouge [sic]

through fraudulent misrepresentations discussed above to sign a sham contract that contained an

invalid non-compete clauses [sic]…."[17]   With respect to Mr. Brown, Plaintiffs allege that

> In April 2014 after the presentation meeting where the PCS
> franchise plan was introduce [sic], Ken Brown was introduce [sic]

---

[14] R. Doc. 27, ¶¶ 5-7.

[15] R. Doc. 27, ¶ 12.

[16] R. Doc. 27, ¶ 13.

[17] R. Doc. 27, ¶ 15. Presumably, Plaintiffs are referring back to paragraph 11 of the Amending Complaint, which purports to list the misrepresentations at issue including "creating and presenting false spread sheets/mock plan to [Plaintiffs] showing the amount of monthly income that could be generated…."   That paragraph also lists "misrepresenting to Ken Brown that he would have authority to open and establish the St. Francisville office as his own…;" "[c]oercing and fraudulently inducing Tammy Cooper to make purchase out of pocket to pay for rent, utilities and telephone for three months by telling Cooper that if she paid for these things out of pocket that she would reach her $25,000.00 sweat investment quicker;" and "[h]aving full knowledge and intent that she was fraudulently misrepresenting that Cooper/Cross Over Therapy and Brown owned their offices in the [sic] St. Francisville and Donaldsonville; when she knew that Bullock was negotiating to sell the offices to Seaside without telling Cooper/Cross Over Therapy or Brown."  *See*, R. Doc. 27, ¶¶ 11 (a), (b), (d), and (p).  *See also*, R. Doc. 27, ¶¶ 11 (q) – (t) (regarding alleged misrepresentation that Seaside was provided with Site Directors' agreements prior to sale). Other subparts of this paragraph do not directly assert fraudulent misrepresentations.  *See*, R. Doc. 27, ¶¶ 11 (c) ("Taking money from the profits of the labor of Ken Brown in the St. Francisville office but refused to make furnish or staff the office"); (h) ("failing to write checks to Tammy Cooper and Cross Over therapy in a timely manner"); (j) ("PCS charged Tammy Cooper, Cross Over Therapy, and Ken Brown a 15% administrative fee to cover services that were not being performed by PCS and did not pay Cooper, Brown or a third party to perform services…."); (k) ("More money was charged to Cooper and Cross Over Therapy for such things as the office phone bill, utilities, and health clinics deductions that were owed"); (l) ("PCS still owed Tammy Cooper approximately $6,000.00 at the time that the business was sold and to date has never been paid to her…."); (m) ("Sold PCS to Seaside without consulting Cooper, Cross Over Therapy or Brown about the sale"); (n) ("Conversion of office equipment…."); (o) ("Conversion of profits owed….").

> by Kim Roundtree and Monica Lewis to a man known as Keil who would be moving to Louisiana to open a franchise in St. Francisville and asked Ken Brown to assist him to find a site; then later told him that Keil had changed his mind and on July 25, 2014 Kim Roundtree and Monica Lewis returned to the Baton Rouge office and told Ken Brown, a PCS employee, that because the deal with Keil had fallen through that they wanted to offer him the opportunity to start the St. Francisville office as his own and that he could either purchase the office with upfront cash or that he could obtain the franchise for the St. Francisville office through the plan to put up $25,000.00 in sweat equity.[18]

Plaintiffs allege that the Individual Defendants solicited them to invest in "a purported franchise scheme" by, *inter alia*, "[c]reating and presenting false spread sheets/mock plan…showing the amount of monthly income that could be generated…."[19]  Plaintiffs further allege that "[a]bout once a month, Kim Roundtree and Monica Lewis came to Louisiana for about a week and worked out of the Baton Rouge office"[20] and that Roundtree and Lewis would "hold meetings and trainings for PCS employees at the Hilton Garden Inn on Harding Boulevard in Baton Rouge, LA."[21]

Plaintiffs allege that "on or about May 5, 2015, without notice to Cooper or Brown, Primary Care Solutions, LLC sold certain named offices including the satellite offices established by Cooper and Brown to Seaside…without paying Cooper/Cross Over Therapy, LLC or Brown any percentage of the profits from the sale of their agency offices to Seaside"[22] and that in a group text between Lewis, Roundtree, and Cooper, Roundtree "intentionally fraudulently misrepresented" that Seaside had been provided with the "Site Director's agreement" and had "committed to honoring the agreements."[23]

---

[18] R. Doc. 27, ¶ 16.

[19] R. Doc. 27, ¶ 11(a).

[20] R. Doc. 27, ¶ 8.

[21] R. Doc. 27, ¶ 10.

[22] R. Doc. 27, ¶ 17.

[23] R. Doc. 27, ¶ 11(s).

In addition to the allegations set forth in the Amending Complaint, in opposition to the original Motion to Dismiss for lack of personal jurisdiction, Plaintiffs provided affidavits from Cooper and Brown.[24]  In her affidavit, Cooper asserts that the Individual Defendants made periodic visits to the Louisiana and also communicated with her via phone, text messages, and emails.[25] Cooper further alleges that her initial contract with PCS was signed while she was in Louisiana,[26] and that the Individual Defendants communicated with her through telephone conversations and text messages regarding the Donaldsonville office while she was in Louisiana.[27]  Similarly, Brown asserts that he met with Bullock in Louisiana three to four times between 2014 and 2015, and that he spoke with him "at the PCS Christmas party that was held in Louisiana."[28]  Brown also asserts that Roundtree and Lewis "would come to meet with us in Louisiana during the third (3rd) week of each month and stay the entire week to check on operations in the Louisiana offices"[29] and that the "presentation meeting" referenced in the Complaint "occurred in 2014 in Louisiana in the Baton Rouge office.  William Bullock, Kim Roundtree, and Monica Lewis were present at the

---

[24] R. Docs. 14-1 & 14-3.

[25] R. Doc. 14-1, ¶ 5 ("Kim Roundtree and Monica Lewis made visits to Louisiana on the average of about once per month between December 2012; when, I started providing contract services to Primary Care Solutions…and I communicated with them by email, text messages, and telephone on the average of serval times per week from my Baton Rouge or Donaldsonville, Louisiana offices or while in transit on Louisiana highway, and they were in North Carolina."); ¶ 6 ("William Bullock made periodic visits to the Louisiana offices, I met with him during visits to the Louisiana offices, but more often, I communicated with him through emails and text messages from my Louisiana office."); ¶ 7 ("In early 2014, I was approached by William Bullock, Monica Lewis and Kim Roundtree at different times via telephone conversations, text messages, emails, and in person visits to the Baton Rouge Office about starting my own satellite agency of PCS in Donaldsonville, LA.").

[26] R. Doc. 14-1, ¶ 13.

[27] R. Doc. 14-1, ¶ 14 ("Attached are some of the emails and text messages between William Bullock, Kim Roundtree, and I referencing the Donaldsonville office as my office.  I was in Louisiana at the time that all emails and text messages were transmitted between us."); ¶ 16 ("While I was in Louisiana and [the Individual Defendants] were in North Carolina, they instructed me through telephone conversations and text messages…."); ¶¶ 27 & 28 (discussing February 4, 2015 email Cooper sent to Lewis in North Carolina while Cooper was in Louisiana, and Lewis' response with copy to Bullock and Roundtree in North Carolina).

[28] R. Doc. 14-3, ¶¶ 4 & 5.

[29] R. Doc. 14-3, ¶ 6.

meeting when I, and others were told that the company had decided to franchise Primary Care Solutions."[30]  Brown asserts that the Individual Defendants "negotiated the contract with me in both Louisiana and North Carolina,"[31] "stalled and interfered with my development of the St. Francisville, LA office"[32] and "came into Louisiana and sold all of the Louisiana office [sic] including the office that I development [sic] in St. Francisville…."[33]

## 1. The Fiduciary Shield Doctrine

"[T]he general rule is that jurisdiction over an individual cannot be predicated upon jurisdiction over a corporation…."  *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985).  As explained by the *Spademan* court, "the fiduciary-shield doctrine…holds that an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation."  *Id.  See also*, *FloQuip, Inc. v Chem Rock Technologies*, Civil No. 16-35, 2016 WL 4574436, at * 12 (W.D. La. June 20, 2016) ("The fiduciary shield doctrine holds that an individual's transaction of business within a state solely as a corporate officer does not create personal jurisdiction over that individual, though the state may have personal jurisdiction over the corporation."); *Service Steel Warehouse, Co., L.P. v. Eakin*, Civil Action No 10-151, 2011 WL 3439132, at * 2 (M.D. La. Aug. 5, 2011) ("The Court notes that the cause of action is based on alleged representations made by the defendant in his role as the corporate representative of a Louisiana corporation.  The Fiduciary Shield Doctrine, however, provides that 'an individual's transaction of business within a state solely as a corporate officer does not create personal

---

[30] R. Doc. 14-3, ¶ 8.

[31] R. Doc. 14-3, ¶ 11.

[32] R. Doc. 14-3, ¶ 13.

[33] R. Doc. 14-3, ¶ 16.

jurisdiction over that individual though the state has in personam jurisdiction over the corporation.'") (citing *Spademan*).

"Although the general rule is that jurisdiction over a corporate officer cannot be predicated upon jurisdiction over a corporation, two exceptions to the fiduciary shield doctrine have been recognized. First, courts may disregard the corporate form and exercise jurisdiction over an individual officer if the corporation is the 'alter ego' of the officer." *FloQuip, Inc. v Chem Rock Technologies*, Civil No. 16-35, 2016 WL 4574436, at * 12 (W.D. La. June 20, 2016) (citing *Spademan*, 772 F.2d at 1197) ("courts have recognized an exception to this rule when the corporation is the alter ego of the individual."). "Second, the court may exercise personal jurisdiction over an officer who allegedly committed an intentional tort directed at the forum state." *Id. See also*, *Calder v. Jones*, 104 S.Ct. 1482, 1487 (1984) (explaining that the individual defendants' "status as employees does not somehow insulate them from jurisdiction" and the exercise of finding personal jurisdiction proper because the individual defendants were "primary participants in an alleged wrongdoing intentionally directed at a California resident….").

Here, Plaintiffs assert that when "the action of the defendants involve torts, intentional misrepresentations, and fraud as are alleged in this lawsuit…the court can exercise specific personal jurisdiction."[34]  Additionally, Plaintiffs argue that this case "is about the alter egos of the corporation using the corporation as a shield for fraud and unfair and deceptive trade practices. Thus, the fiduciary shield doctrine does not apply in this case."[35]  Accordingly, Plaintiffs seek to rely on both exceptions to the fiduciary shield doctrine to find this court has personal jurisdiction over the Individual Defendants.

---

[34] R. Doc. 35, p. 5.

[35] R. Doc. 35, p. 8.

### a.   Individual Defendants as Alter Egos of PCS

In the March's 21, 2017 Ruling, this court found that Plaintiffs failed to provide a basis for finding that the Individual Defendants were the "alter egos" of PCS.[36]  In so finding, the court noted that Plaintiffs failed to controvert the Declaration of William Bullock, wherein he asserted that "[a]t all applicable times, Primary Care Solutions maintained a separate legal existence.  For example Primary Care Solutions filed Articles of Incorporation with the North Carolina Secretary of State, filed annual reports, appointed an agent, maintained its own separate bank accounts, and observed other corporate formalities."[37]

Plaintiffs assert throughout their Amending Complaint that the Individual Defendants are the "alter egos" of PCS.  In contrast to their original complaint, the Amending Complaint sets forth a list of reasons purporting to support the assertion that the Individual Defendants should be considered the alter egos of PCS:

   a.   PCS was undercapitalized, and in approximately April or May 2015, Kim Roundtree advised Tammy Cooper that PCS was selling to Seaside because PCS didn't have three months of payroll to cover the sites and all of the employees.

   b.   PCS was insolvent as supported by such acts as the following:

      1.   On June 11, 2014, Kim Roundtree sent Tammy Cooper a text message directing Tammy Cooper to write a personal check to PCS to cover the rent, phone bill and utilities for the Donaldsonville office. The text from Kim Roundtree to Tammy Cooper specifically stated as follows:

      Just so that we are on the same page… as fae [sic] as rent, phone and utilities, Tammy will provide the funds to PCS and PCS will pay those expenses. For example, Tammy you write a check to pcs(sic) for the rent for 800 and pcs(sic) will write the check to the landlord.

---

[36] R. Doc. 26, pp. 11-12.

[37] R. Doc. 10-2, ¶ 10.

2. Coercing Tammy Cooper through text messaging on August 29, 2014 to pay the rent on the Donaldsonville office for September and October by working two extra days as an employee of PC [sic] instead of being paid for her work.

3. PCS did not write checks to Tammy Cooper and Cross Over therapy in a timely manner.

4. PCS entered into sham contracts with Tammy Cooper, Cross Over Therapy and Ken Brown to establish additional sites of PCS as a method to facilitate additional profits to PCS.

5. In mid to late 2014, PCS started increasing their profit margin by increasing the billing for group sessions and camps.

6. PCS charged Tammy Cooper, Cross Over Therapy, and Ken Brown a 15% administrative fee to cover services that were not being performed by PCS and did not pay Cooper, Brown or a third party to perform services such as the following:

   i. To pay for a Licensed Mental Health Professional (LMHP), but Tammy Cooper and Ken Brown were the LMHPs that were not paid for their services as a LMPH [sic] to the Donaldsonville and St. Francisville sites.

   ii. Fees were also deducted for an administrative receptionist, but Cooper and Brown scheduled their own appointments.

   iii. Fees were charged for a utilization review manager, but Cooper and Brown kept up with authorizations, and when, they needed to be reauthorized.

7. More money was charged to Cooper and Cross Over Therapy for such things as the office phone bill, utilities, and health clinics deductions than were owed.

8. PCS still owed Tammy Cooper approximately $6,000.00 at the time that the business was sold and to date has never been paid to her, and Kim Roundtree verified that money was owed to Tammy Cooper/Cross Over Therapy in a text dated May 16, 2015; wherein, Roundtree advised that the profit check due would be paid by PCS.

9. Sold PCS to Seaside without consulting Cooper, Cross Over Therapy or Brown about the sale.

10. Conversion of office equipment owned by Cooper/Cross Over Therapy.

11. Conversion of profits owed to Cooper/Cross Over Therapy and Brown.

12. The corporation was the alter ego of its dominant shareholder, William Bullock, is supported by: Per the incorporation documents filed with the North Carolina Secretary of State, William Bullock was the President of PCS and the sole owner of the total 1000 shares that Primary Care Solutions is authorized to issue at a $5.00 par value.

    i.  In telephone conversation on February 4, 2015 Kim Roundtree and Monica Lewis told Tammy Cooper and Ken Brown that William Bullock was the only shareholder, owned everything, and that Kim Roundtree and Monica Lewis were actually just consultants/managing partners.

    ii.  On information and belief, there was siphoning of funds by the dominant shareholder.[38]

Factors that have been considered in determining whether a corporation is the alter ego of its dominant shareholder include whether the corporation is undercapitalized, does not keep separate books or finances, is used to promote fraud or illegality, does not follow corporate formalities, and is merely a sham. *See*, *Spademan*, 772 F.2d at 1197. Similar factors are considered by courts applying either Louisiana or North Carolina law. *See*, *Dykes v. Maverick Motion Picture Group, LLC*, Civil Action No. 08-536, 2011 WL 900276, at * 5 (M.D. La. March 14, 2011) ("In determining whether to 'pierce the corporate veil' under an alter-ego theory, courts consider factors such as whether a corporation was adequately capitalized for the undertaking, whether the corporation was solvent, whether the entity paid dividends to the shareholders, whether officers and directors acted properly, and whether the corporation acted as a façade for the dominant shareholder."); *Green v. Freeman*, 367 N.C. 136, 270 (N.C. 2013) ("Evidence upon which we have relied to justify piercing the corporate veil includes inadequate capitalization, noncompliance with

---

[38] R. Doc. 27, ¶ 4.

corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records.").[39]  Here, although Plaintiffs have included the words "undercapitalized" and "insolvent" in their Amending Complaint, the alleged facts supporting such assertions are lacking.  Further, while Plaintiffs allege "there was a siphoning of funds by the dominant shareholder" (presumably meaning Mr. Bullock), they have provided no support for such assertion, and the thrust of the allegations set forth in Plaintiffs' "alter ego" paragraph appears to be simply a rehashing of Plaintiffs' claims regarding alleged breaches of the agreements at issue and conversion.

Here, Plaintiffs have not provided sufficient factual information to make a *prima facie* showing that the Individual Defendants named should be considered the alter egos of PCS. *Compare*, *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management*, 519 F.2d 634, 638 (8th Cir. 1975) (outlining evidence showing that particular individual defendant "dominated and controlled the business and treated it as his own."); *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) ("federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court.  The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of

---

[39] Defendants assert that because PCS is a North Carolina corporation, North Carolina law should control the question of whether the Individual Defendants are alter egos of PCS.  *See*, R. Doc. 33-1, pp. 7-8.  Plaintiffs do not address choice of law in their briefing.  However, because the factors to be considered are substantially similar, the undersigned does not find there to be a conflict of law question presented.  *See*, R. Doc. 33-1, p. 9 (memorandum in support of motion to dismiss noting Louisiana's alter ego law is "very similar to North Carolina law.").  *See also*, *Bilyeu v. Johanson Berenson LLP*, Civil Action No. 08-2006, 2010 WL 3896415, at * 5 (W.D. La. Sept. 30, 2010) ("If the laws of two states are substantially similar such that they would yield the same resolution of a particular [issue] then there is no conflict and no need for a conflict of laws analysis.").

one are the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis.") (citing *Lakota*, 519 F.2d at 637)).  Without the necessary linkage between the alleged insolvency or undercapitalization of PCS and these particular Individual Defendants, the court cannot superimpose the forum contacts of PCS upon the Individual Defendants and therefore personal jurisdiction over the Individual Defendants cannot be exercised based on their alleged status as the "alter egos" of PCS.

### b. The Individual Defendants' Alleged Torts and Intentional Misrepresentations

This court has explained that "for a court to exercise jurisdiction over a corporate representative, the individual must have personally engaged in activities within the forum state which would bring him within the state's long-arm statute, for instance, by committing a tort, such as fraud, in the forum state." *Dykes v. Maverick Motion Picture Group, LLC*, Civil Action No. 08-536, 2011 WL 900276, at * 5 (M.D. La. March 14, 2011) (internal citations omitted).  *See also*, *Sheriff's Office of St. Tammany Parish v. Nathan*, Civil Action No. 14-442, 2015 WL 3651343, at * 5 (E.D. La. June 11, 2015) ("The exception provides that the fiduciary shield doctrine will not defeat personal jurisdiction where a non-resident corporate agent commits a tort within the forum state which would subject him to personal liability under the laws of that state."); *Canada Crown Inv. Corp. v. Colt Production Corp., Inc.*, Civ. A. No. 94-2766, 1995 WL 65119, at * 1 (E.D. La. Feb. 15, 1995) ("if a corporate officer engages in tortious conduct in his corporate capacity in that forum, a court may consider that conduct as contact with the forum sufficient to support personal jurisdiction over that officer in his individual capacity."); *Southeast Wireless Network, Inc. v. U.S. Telemetry Corp.*, 954 So.2d 120, 128 (La. 2007) ("The court in [*Escoto v. U.S. Lending Corp.*, 675 So.2d 741 (La. App. 4 Cir. 1996)] went on to recognize an exception to the fiduciary shield doctrine, which provides that the fiduciary shield doctrine will not defeat personal jurisdiction

15

where a non-resident corporate agent commits a tort within a forum state which would subject him to personal liability under the laws of that state."). *See also*, *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (personal jurisdiction over individual defendant proper despite assertion that all of defendant's forum contacts were in the context of his employment because individual had direct contact with Mississippi and under Mississippi law, a corporate officer could be held directly liable when he participated in or authorized the commission of a tort even on behalf of the corporation); *Bellino v. Simon*, Civ. A. 99-2208, 1999 WL 1059753, at * 3 (E.D. La. Nov. 22, 1999) ("the Fifth Circuit has recognized a fraud exception to the fiduciary shield doctrine, and district courts have extended it to other intentional torts.  Because plaintiffs allege that defendants committed fraud and defamation in Louisiana, the fiduciary shield doctrine does not preclude jurisdiction.") (internal citations omitted).

In *Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001), the Fifth Circuit found there was "sufficient evidence of minimum contacts to justify personal jurisdiction" by a Texas court over an individual director of Mad Martha's Ice Cream, Inc. ("Mad Martha's"), Rosenfeld, and the individual president of Mad Martha's, Farkas.  There, Rosenfeld "failed to correct allegedly false statements" made by another Mad Martha's director while participating in a telephone conversation with plaintiff designed to convince plaintiff to make a $650,000.00 loan to Mad Martha's and also "prepared and sent loan documents and stock certificates" to plaintiff" that "contained fraudulent misstatements."  *Id*. at 358.  Similarly, Farkas allegedly "signed and sent security agreements to [plaintiff] in Texas that fraudulently represented that [plaintiff[ would receive a first lien" on a specific Mad Martha's store in Nantucket.  *Id*.  In finding the exercise of specific personal jurisdiction proper, the court noted that plaintiff contended that "all of the defendants intentionally defrauded him by lying about the ownership of the Nantucket Mad

16

Martha's store." *Id*. at 359. The court explained that "'[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment'" and that "[t]he 'actual content' of Rosenfeld's and Farkas' communications to Lewis shows purposeful availment of the benefits and protections of Texas law." *Id*. (citing *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999)). In response to Farkas' argument that he was immune from suit under the fiduciary shield doctrine, the Fifth Circuit explained that "[t]his is not a case where plaintiff's claim rests on nothing more than Farkas' status as a corporate officer. Instead, [plaintiff] contends that Farkas deliberately misled him so that Mad Martha's and Farkas would get the money needed to keep Mad Martha's afloat until the private placement. Therefore, the fiduciary shield doctrine should not apply." *Id*. at 359, n. 6 (citing *Darovec Marketing Group, Inc. v. Bio-Genics, Inc.*, 42 F.Supp.2d 810, 819 (N.D. Ill. 1999) ("the shield is removed if the individual's personal interests motivate his actions….")).

Similarly, in *General Retail Services, Inc. v. Wireless Toyz Franchise, LLC*, 255 Fed. Appx. 775, 777 (5th Cir. 2007), plaintiff alleged that defendants, including the individual officers of two corporations, induced them to purchase a franchise by intentionally, recklessly, or negligently making false misrepresentations. The Fifth Circuit found there was sufficient evidence submitted to justify the exercise of personal jurisdiction by a Texas court over one of the individual defendants, Richard Simtob. *Id*. at 792. The court noted that "Simtob allegedly sent the marketing materials and Offering Circular that contained the alleged misrepresentations to [plaintiff] in Texas" and that Simtob "drafted the portion of the Offering Circular that made representations concerning the Wireless Toyz model store's profitability; he presented [plaintiff] with the Franchise Agreement in Texas; and he accepted the executed Franchise Agreement and franchise fee in Texas. Thus, [plaintiff] established that Simtob purposefully directed his activities to Texas

17

because he created and intentionally sent the Offering Circular to Texas." *Id*. at 794.  In rejecting Simtob's argument that personal jurisdiction over him could not be exercised based on the fiduciary shield doctrine, the court explained that "while the fiduciary-shield doctrine could prohibit this court from ascribing acts of the Wireless Toyz to Simtob, it does not prohibit Simtob from being held personally liable for his own tortious conduct simply because he is an officer of a corporation." *Id*. at 795.

Here, Plaintiffs do not argue that the forum contacts of PCS should be attributed to the Individual Defendants and this court focuses on each Individual Defendant's alleged individual contacts with Louisiana.  *Recinos-Recinos v. Express Forestry, Inc.*, No. Civ. A 05-1355, 2005 WL 3543722, at * 3 (E.D. La. Oct. 6, 2005) ("Although the doctrine has been recognized in this circuit, the fiduciary shield doctrine is irrelevant if the plaintiffs are not seeking to attribute the corporation's contacts to the individual defendant.").  *See also*, *United States v. Insurance Company of the State of Pennsylvania*, No. 5:15-CV-81 (Lead) c/w No. 5:15-cv-1744, 2016 WL 1718268, at *3-4 (W.D. La. April 25, 2016) (explaining that the fiduciary shield doctrine requires consideration of each defendant's individual and personal contacts, and that while the fiduciary shield precluded the exercise of personal jurisdiction over the individual defendant based on the corporation's contacts with the forum state, personal jurisdiction over the individual defendant based on the individual's own personal contacts with the forum was proper based on the defendant's "alleged commission of torts in the course of his project management" and explaining "this court has consistently recognized that the fiduciary shield doctrine does not apply where, as here, the nonresident corporate employee is alleged to have acted fraudulently or tortiously in the forum state.").

Per the Amending Complaint, Plaintiffs allege that Bullock, Lewis, and Roundtree "during a presentation meeting at the Baton Rouge office of PCS" told Brown "that the company had decided to franchise Primary Care Solutions"[40] and that the Individual Defendants "came to Baton Rouge Louisiana in March and April 2014 and convinced Tammy Cooper…through fraudulent misrepresentations…to sign a sham contract…."[41]  Despite these alleged representations, Plaintiffs allege that they were later told that their offices could not be franchises.[42]  Plaintiffs further allege that both Roundtree and Lewis were involved in a group text wherein negotiations with Seaside were allegedly fraudulently misrepresented[43] and that after Seaside was sold, Lewis "continued to fraudulently represent to" Cooper the status of her contract through a May 16, 2015 text message.[44]  Plaintiffs allege that following the sale to Seaside, Roundtree "verified that money was owed to" to Cooper and "advised that the profit check would be paid by PCS."[45]  Plaintiffs allege that Brown "discussed the open ended nature of his contract with" Roundtree and Lewis "and was assured the time frame for collecting the 40% profit was an indefinite period."[46]

Based on these allegations, the court finds that Plaintiffs have made a "*prima facie* showing of personal jurisdiction," *Johnston*, 523 F.3d at 609, over the Individual Defendants based on the alleged contacts of the Individual Defendants with the forum state and Plaintiffs' causes of action allegedly arising out of those contacts.[47]  *See*, *Hoover v. Florida Hydro, Inc.*, Civil Action No. 07-

---

[40] R. Doc. 27, ¶ 13.

[41] R. Doc. 27, ¶ 15.

[42] R. Doc. 27, ¶ 46 ("By email dated February 4, 2015…Lewis replied 'No legally, it cannot be a franchise' and copied alter egos William Bullock and Kim Roundtree and Plaintiff, Ken Brown.").

[43] R. Doc. 27, ¶ 11(s).

[44] R. Doc. 27, ¶ 11(v).

[45] R. Doc. 27, ¶ 4(b)(8).

[46] R. Doc. 27, ¶ 52.

[47] Although Plaintiffs provide fewer specific allegations regarding Bullock, as discussed herein, a single contact can be sufficient to confer specific personal jurisdiction, and Plaintiffs have alleged that they were told by Bullock,

1100, 2009 WL 1380619, at * 4 (E.D. La. May 14, 2009) ("The phone call at issue in the case at the bar was alleged to fraudulently induce plaintiff into creating an oral agreement modifying the contract. 'When the actual content [of] communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.' Albeit weak, Williams' initiation of a telephone call to Hoover, during which he allegedly made fraudulent misrepresentations that induced Hoover to enter the contract is sufficient to support the exercise of personal jurisdiction over Williams.") (internal citations omitted).

"Once a plaintiff establishes minimum contacts between the defendant and the forum state, the burden of proof shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable." *Nuovo Pignone*, 310 F.3d at 379. Here, the Individual Defendants have failed to set forth any basis for a finding that the assertion of personal jurisdiction over them would be unfair and unreasonable. *See*, *United States v. Insurance Company of the State of Pennsylvania*, No. 5:15-CV-81 (Lead) c/w No. 5:15-cv-1744, 2016 WL 1718268, at *3-4 (W.D. La. April 25, 2016) ("The court also finds that Kuphal fails to make a 'compelling case' that asserting jurisdiction over him would be unfair or unreasonable."); *Casares v. Agri-Placements Intern., Inc.*, Civil No. B-11-107, 12 F.Supp.3d 956, 970 (S.D. Tex. March 31, 2014) (Flaming does not separately argue that exercising personal jurisdiction in this action will offend traditional notions of fair play and substantial justice. 'Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair.' Since Flaming has not carried this burden, the Court does not consider further whether she has made a 'compelling case against it.'") (internal citations omitted).

---

Roundtree, and Lewis during a presentation meeting in Baton Rouge in March or April 2014 that PCS had decided to franchise. R. Doc. 27, ¶ 13. Additionally, Plaintiffs allege that Bullock was copied on the February 4, 2015 email exchange wherein Cooper asked about a franchise agreement for an extended period of time and was ultimately told that it could not be a franchise. R. Doc. 27, ¶¶ 43-46.

Based on the allegations relating to each Individual Defendants' forum contacts and Plaintiffs' causes of action arising therefrom, as well as the Individual Defendants' failure to meet their burden of showing that the assertion of personal jurisdiction would be unfair or unreasonable, the court finds that personal jurisdiction over the Individual Defendants is proper. Accordingly, the Individual Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is DENIED.

### B. Rule 12(b)(6) Failure to State a Claim

In addition to asserting that Plaintiffs' claims against the Individual Defendants should be dismissed for lack of personal jurisdiction, Defendants also assert that certain of Plaintiffs' claims should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.[48] A motion filed pursuant to Rule 12(b)(6) challenges the sufficiency of a plaintiff's allegations. "When ruling on a 12(b)(6) motion, the court accepts the plaintiff's factual allegations as true, and construes all reasonable inferences in a light most favorable to the plaintiff or the nonmoving party." *Freeman v. Rubin*, No. 11 CV 1254, 2012 WL 820472, at * 1 (W.D. La. March 8, 2012) (citing *Gogreve v. Downtown Development District*, Civ. A 05-2112, 426 F.Supp.2d 383, 388 (E.D. La. 2006)). *See also*, *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). To avoid dismissal pursuant to Rule 12(b)(6), Plaintiffs must plead enough facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 US 544 (2007). "Rule 8 does not require 'detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" *Brand Coupon Network, LLC v. Catalina Marketing Corp.*, 748 F.3d 631, 634 (5th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (internal quotation marks omitted)). As this court has previously explained "[s]tated differently, a complaint must state 'more than labels and conclusions'; 'a formalistic recitation of the elements of a cause of action will not do.'" *Rodrigue*

---

[48] Defendants do not seek dismissal of Plaintiffs' breach of contract claim against PCS.

*v. Seafood Source of Louisiana, Inc.*, Civil Action No. 13-817, 2014 WL 4986840, at * 2 (M.D. La. Sept. 15, 2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In addition to claims against PCS, Plaintiffs assert claims against the Individual Defendants under the Louisiana Unfair Trade Practices Act and Fair Labor Standards Act, as well as for breach of contract, interference with contract, conversion and unjust enrichment. As discussed herein, the undersigned finds that Plaintiffs have failed to state a claim against the Individual Defendants. Critically, for many of Plaintiffs' claims against the Individual Defendants, Plaintiffs have failed to set forth any basis upon which this court could infer that the Individual Defendants (rather than PCS) benefitted.[49] This court previously explained this deficiency in its March 21, 2017 Ruling in the context of Plaintiffs' unfair trade practices act claim.[50]

### 1. Louisiana Unfair Trade Practices Act ("LUTPA")

LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." La. R.S. § 51:1405(A). "Louisiana has left the determination of what is an 'unfair trade practice' largely to the courts to decide on a case-by-case basis." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993). *See also*, *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So. 3d 1053, 1059 (La. 2010) ("It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition.") (citing *Dufau v. Creole Engineering, Inc.*, 465 So.2d 752, 758 (La. App. 5 Cir. 1985)

---

[49] Plaintiffs do allege that Bullock is "the sole owner of the total 1000 shares that Primary Care Solutions is authorized to issue at a $5.00 par value." R. Doc. 27, ¶ 5. However, without more, the court will not assume that Bullock personally obtained a benefit simply based on his status as the sole shareholder of PCS. *See, e.g.*, *Town of Haynesworth, Inc. v. Entergy Corp.*, 956 So. 2d 192, 197 (La. App. 2 Cir. 2007) ("The involvement of a sole or majority shareholder in a corporation is not sufficient alone to establish a basis for disregarding the corporate entity."). Moreover, with respect to Roundtree and Lewis, Plaintiffs' allegation that they were told "William Bullock was the only shareholder, owned everything, and that Kim Roundtree and Monica Lewis were actually just consultants/managing partners" cuts against an assumption that Roundtree and Lewis personally benefitted here. R. Doc. 27, ¶ 4(b)(12)(a).

[50] R. Doc. 26, p. 17. *See also*, *infra*, n. 60.

(In order to recover under LUTPA a plaintiff must prove "some element of fraud, misrepresentation, deception, or other unethical conduct" on the part of the defendant.)).

"The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct 'offends established public policy and ... is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'" *Cheramie*, 35 So. 3d at 1059 (citations omitted). The Louisiana Supreme Court has explained that "the range of prohibited practices under LUTPA is extremely narrow." *Cheramie*, 35 So. 3d at 1060. Further, the Fifth Circuit has held that "the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Turner*, 989 F. 2d at 1422. *See also*, *Innovative Sales, LLC v. Northwood Mfg., Inc.*, No. 07-30598, 2008 WL 3244114, at * 6 (5th Cir. 2008) ("Innovative argues that the same actions taken by Northwood that support a breach of contract claim also support a LUTPA claim. This argument, however, is foreclosed by *Turner v. Purina Mills, Inc.*, wherein this court expressly acknowledged that LUTPA 'does not provide an alternate remedy for simple breaches of contract,' noting that '[t]here is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.'").

In the March 21, 2017 Ruling, this court rejected Plaintiffs' argument that the sale of the St. Francisville and Donaldsonville offices without making the allegedly proper payments to Plaintiffs could, without more, support a claim under LUTPA. In so holding, the court explained that "Plaintiffs' allegations are more akin to a breach of contract claim than the sort of 'egregious' behavior contemplated by LUTPA."[51] The court applied a heightened pleading standard under Fed. R. Civ. P. 9(b), and explained that "although Plaintiffs allege that Defendants engaged in

---

[51] R. Doc. 26, p. 18.

fraudulent conduct in general terms throughout their Complaint, Plaintiffs fail to provide any specifics with regard to what was said to them, by whom it was said or where, and what (especially with respect to the Individual Defendants) was obtained thereby."[52]   In dismissing Plaintiffs' LUTPA claim, the court noted that "Plaintiffs have not outlined in their Complaint how they contend they were 'coerced' into signing the contracts with PCS, and…have not alleged any specific fraud, misrepresentation, deception, or unethical conduct in the negotiation of their contracts with PCS."[53]

Here, per their Amending Complaint, Plaintiffs assert that the following amount "to fraud, deceit, and misrepresentation by soliciting employees of PCS, Tammy Cooper and Kendall 'Ken Brown' to invest in a purported franchise investment scheme without following federal or Louisiana franchising or security laws…:"[54]

a.  Creating and presenting false spread sheets/mock plan to Cooper/Cross Over Therapy in approximately April 2014 and Brown in approximately July 2014 showing the amount of monthly income that could be generated; if, they provided a sweat equity investment to purchase a vested interest in PCS by establishing offices in Donaldsonville and St. Francisville.

b.  Misrepresenting to Ken Brown that he would have authority to open and establish the St. Francisville office as his own, but PCS maintained control over the office and he had to get permission to

---

[52] R. Doc. 26, p. 17.

[53] R. Doc. 26, p. 16.

[54] As explained in the March 21, 2017 Ruling, to the extent Plaintiffs rely on the alleged failure to provide franchise disclosure documents as a basis for their LUTPA claim, the only Louisiana court to consider this issue has found that "the failure to comply with the FTC disclosure regulations did not constitute an unfair trade practice" where there was "no element of fraud, misrepresentation, deception or unethical conduct in the confection of the franchise agreement." *Leblanc v. Belt Center Inc.*, 509 So. 2d 134, 137 (La. App. 1 Cir. 1987).  *See also*, *Brill v. Catfish Shaks of America, Inc.*, Civ. A No. 86-3345, 727 F.Supp. 1035, 1041 n. 12 (E.D. La. 1989) (noting that although Federal Trade Commission regulations provide that it is an unfair or deceptive act or practice for a franchisor to fail to provide the franchisee with a disclosure document, the court would be "bound to follow" the holding of *Leblanc* "that the failure to provide a disclosure document is not *per se* violative of Louisiana's UTPA because an unfair trade practice requires a showing of fraud, misrepresentation, deception, or unethical conduct" if plaintiffs' LUTPA claim was not otherwise time barred).

make purchases such as desk, computer, phones, fax machine, furniture;

c.   Taking money from the profits of the labor of Ken Brown in the St. Francisville office but refused to make furnish or staff the office.

d.   Coercing and fraudulently inducing Tammy Cooper to make purchase out of pocket to pay for rent, utilities and telephone for three months by telling Cooper that if she paid for these things out of pocket that she would reach her $25,000.00 sweat investment quicker.

e.   Coercing Tammy Cooper through text messaging on August 29, 2014 to pay the rent on the Donaldsonville office for September and October by working two extra days as an employee of PC [sic] instead of being paid for her work.

f.   On June 11, 2014, Kim Roundtree sent Tammy Cooper a text message directing Tammy Cooper to write a personal check to PCS to cover the rent, phone bill and utilities for the Donaldsonville office. The text from Kim Roundtree to Tammy Cooper specifically stated as follows:

Just so that we are on the same page… as fae [sic] as rent, phone and utilities, Tammy will provide the funds to PCS and PCS will pay those expenses. For example, Tammy you write a check to pcs(sic) for the rent for 800 and pcs (sic) will write the check to the landlord.

g.   Coercing Tammy Cooper through text messaging on August 29, 2014 to pay the rent on the Donaldsonville office for September and October by working two extra days as an employee of PC instead of being paid for her work.

h.   Failing to write checks to Tammy Cooper and Cross Over therapy in a timely manner.

i.   PCS entered into sham contracts with Tammy Cooper, Cross Over Therapy and Ken Brown to establish additional sites of PCS as a method to facilitate additional profits to PCS

j.   PCS charged Tammy Cooper, Cross Over Therapy, and Ken Brown a 15% administrative fee to cover services that were not being performed by PCS and did not pay Cooper, Brown or a third party to perform services such as the following:

   i.   To pay for a Licensed Mental Health Professional (LMHP), but Tammy Cooper and Ken Brown were the LMHPs that were not

paid for their services as a LMPH [sic] to the Donaldsonville and St. Francisville sites.

ii. Fees were also deducted for an administrative receptionist, but Cooper and Brown scheduled their own appointments.

iii. Fees were charged for a utilization review manager, but Cooper and Brown kept up with authorizations, and when, they needed to be reauthorized.

k. More money was charged to Cooper and Cross Over Therapy for such things as the office phone bill, utilities, and health clinics deductions than were owed.

l. PCS still owed Tammy Cooper approximately $6,000.00 at the time that the business was sold and to date has never been paid to her, and Kim Roundtree verified that money was owed to Tammy Cooper/Cross Over Therapy in a text dated May 16, 2015; wherein, Roundtree advised that the profit check due would be paid by PCS.

m. Sold PCS to Seaside without consulting Cooper, Cross Over Therapy or Brown about the sale.

n. Conversion of office equipment owned by Cooper/Cross Over Therapy.

o. Conversion of profits owed to Cooper/Cross Over Therapy and Brown.

p. Having full knowledge and intent that she was fraudulently misrepresenting that Cooper/Cross Over Therapy and Brown owned their offices in the St. Francisville and Donaldsonville; when she knew that Bullock was negotiating to sell the offices to Seaside without telling Cooper/Cross Over Therapy or Brown.

q. Having full knowledge of the intent to sell all Louisiana offices to Seaside, misrepresenting the reason that she was in Louisiana in early 2015 to start training employees of PCS, including Cooper and Brown to perform functions that normally had been performed in the North Carolina office.

r. In April 2015, intentionally fraudulently misrepresented in a meeting that the alter egos of PCS, William Bullock, Kim Roundtree and Monica Lewis had negotiated with Seaside to allow Cooper/Cross Over Therapy to keep the St. Francisville and Donaldsonville office and share in 40% of the profits after the sale to Seaside.

26

s. In an group text between Monica Lewis Kim Roundtree and Tammy Cooper, Kim Roundtree intentionally fraudulently misrepresented to Tammy Cooper as follows:

Tammy, we provided Seaside with the Site Director's agreement during our due deligence (sic) process. They committed to honoring the agreements. Additionally, we included payment of profit in the budget.

t. Seaside denies that the Site Director/investment agreements signed by Cooper/Cross Over Therapy and Brown were ever provided to Seaside prior to the sale of PCS to Seaside.

u. After the sale to Seaside, in a text message dated May 16, 2015, Monica Lewis actually admitted that she and Kim Roundtree were not owners, but that Lewis and Roundtree were participating in a money making scheme with William Bullock. The text message from Monica Lewis actually stated:

…. It's a similar situation with William, myself and Kim. Kim and I are not owners of the company but would it have been smart to let us go? We were making him money with little headache!!!! A true win win situation.

v. Even after Seaside was sold, when Tammy Cooper inquired whether she would be allowed to renegotiate her contract with Seaside, Monica Lewis continued to fraudulently represent to Tammy Cooper through a text message dated May 16, 2015 as follows:

We have not gotten that far. We were focused on advocating that you guys remain and have potential to remain as a sharer in profit.[55]

Plaintiffs' Amending Complaint is not the picture of clarity.  However, Plaintiffs claim that Defendants violated LUTPA by "coercing and inducing" Plaintiffs into entering "a franchise investment scheme and fraudulent investment contracts with unlawful non-compete clauses to prevent them from opening their own competing businesses; then, selling the Donaldsonville and St. Francisville office [sic] on May 5, 2015 to Seaside…."[56]  While the majority of Plaintiffs' specific allegations are directed to a traditional breach of contract claim (*i.e.*, the failure to pay

---

[55] R. Doc. 27, ¶ 11.

[56] R. Doc. 27, ¶ 57.

Plaintiffs' the 40% of profits allegedly due following Plaintiffs' "sweat equity investment"), Plaintiffs also allege that they were coerced into entering the site director agreements at issue based on the provision of false spread sheets, and that following their entry into the agreements, Defendants "fraudulently misrepresented" the status of negotiations between PCS and Seaside. The most specific allegation in this regard is found in paragraph 11(s) of the Amending Complaint, which includes the alleged language of a group text wherein Roundtree stated that Seaside had committed to honoring the Plaintiffs' site director agreements.  Although Plaintiffs' allegations are for the most part scattershot, it does appear that such allegations fall outside those necessary to Plaintiffs' breach of contract claim and Plaintiffs have made particularized allegations regarding misrepresentations by the Defendants.  *See*, *Tubos de Acero de Mexico v. American International Investment Corp., Inc.*, 292 F.3d 471, 482 (5th Cir. 2002) ("considering the deceptive and unethical undertones of TAMSA's alleged behavior during the 1997 lease period, we conclude that American's LUTPA counterclaim is not properly characterized as a mere breach of contract claim."); *First American Bankcard, Inc. v. Smart Business Technology, Inc.*, Civil Action No. 15-638, 178 F.Supp.3d 390, 406 (E.D. La. April 12, 2016) (denying motion to dismiss LUTPA claim where "allegations are similar to the breach of contract claim, but they are not identical…").

Throughout the Amending Complaint, Plaintiffs allege that Defendants "fraudulently induc[ed]," "intentionally fraudulently misrepresented," and "fraudulently misrepresented."[57] Based on Plaintiffs' allegations of fraud, Plaintiffs' LUTPA claim is subject to the heightened pleading standards set forth in Rule 9(b).[58]  *See*, *Brand Coupon Network, LLC v. Cataline Marketing Corp.*, No. 11-556, 2014 WL 6674034, at * 5 (M.D. La. Nov. 24. 2014) ("Where a

---

[57] *See*, *e.g.*, R. Doc. 27, ¶¶ 11(d), 11(p), 11(r), 11(v), and 15.

[58] *See also*, R. Doc. 26, pp. 16-17.

plaintiff's LUTPA claim is based on alleged fraudulent misrepresentation, the LUTPA claim must meet the heightened pleading requirements of Rule 9(b).").[59]  Fed. R. Civ. P. 9(b) "imposes a heightened level of pleading for fraud claims: 'In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.'" *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994).  "'What constitutes 'particularity' will necessarily differ with the facts of each case….' 'At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *Benchmark Elec. Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003) (quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992) and *Tel-Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)).  Here, although Plaintiffs have provided additional information with regard to what was said to them, by whom it was said and where, Plaintiffs' allegations regarding what (if anything) the Individual Defendants obtained thereby are still generally lacking.[60]  Further, for the

---

[59] At least one court in this Circuit has refused to apply the heightened pleading requirements of Rule 9(b) in deciding a Motion to Dismiss for failure to state a claim where plaintiff alleged misrepresentations but did not explicitly allege fraud or fraudulent misrepresentations.  *Mabile v. BP, plc*, Civil Action No. 11-1783, 2016 WL 5231839, at * 25 (E.D. La. Sept. 22, 2016).  As explained by the *Mabile* court, "Louisiana courts have stated that a practice is unfair 'when the practice is unethical, oppressive, unscrupulous, or substantially injurious.'  Likewise, Louisiana courts have described a trade practice as deceptive when it amounts to 'fraud, deceit or misrepresentation.'  Thus, it is clear that LUTPA claims are not limited solely to allegations of fraud, but may be independently premised on a range of non-fraudulent conduct."  *Id.* at * 24 (internal citations omitted).  In contrast to *Mabile*, Plaintiffs here argue that "[t]his case is not a 'garden variety' contract dispute, it is actually about fraud, manipulation, and misrepresentation by corporate officers and directors, the alter egos, of Primary Care Solutions…."  R. Doc. 35, pp. 2-3.

[60] The court previously explained this deficiency in its March 21, 2017 Ruling.  R. Doc. 26, p. 17 ("Here, although Plaintiffs allege that Defendants engaged in fraudulent conduct in general terms throughout their Complaint, Plaintiffs fail to provide any specifics with regard to what was said to them, by whom it was said or where, and what (especially with respect to the Individual Defendants) was obtained thereby.").  In the Amending Complaint, Plaintiffs allege that Bullock was the sole shareholder of PCS while Roundtree and Lewis were directors and/or managing partners.  *See*, R. Doc. 27, ¶ 4(b)(12) (alleging that incorporation documents show that Bullock is "the sole owner of the total 1000 shares that Primary Care Solutions is authorized to issue at a $5.00 par value."); ¶ 5 ("At all relevant times herein, alter ego, William Bullock, is the President of PCS and the sole owner of the total 1000 shares that Primary Care Solutions is authorized to issue at a $5.00 par value."), ¶ 4(b)(12)(a) ("In a telephone conversation on February 4, 2015, Kim Roundtree and Monica Lewis told Tammy Cooper and Ken Brown that William Bullock was the only shareholder, owned everything, and that Kim Roundtree and Monica Lewis were actually just consultants/managing partners."); ¶ 6 ("At all relevant times herein, alter ego, Monica Lewis, is a director, consultant and managing partner of PCS who assisted William Bullock in perpetuating a fraud against Tammy Cooper, Cross Over Therapy and Ken

same reasons personal jurisdiction over the Individual Defendants cannot be exercised based on the Individual Defendants' alleged status as the "alter egos" of PCS, anything purportedly obtained by PCS through the unfair trade practices alleged by Plaintiffs cannot be imputed to the Individual Defendants.  Accordingly, the court DENIES Defendants' Motion to Dismiss Plaintiffs' LUTPA claim against PCS but GRANTS Defendants' Motion to Dismiss Plaintiffs' LUTPA claim against the Individual Defendants.

## 2.  Breach of Contract Against the Individual Defendants

The court notes that the contracts at issue all appear to be between Plaintiffs and PCS; the Individual Defendants are not parties to these contracts.[61]  As explained by this court, "'[i]t is obvious that an individual cannot be liable for breach of a contract to which he is not a party.'" *Cardiovascular Specialty Care Center of Baton Rouge, LLC v. United Healthcare of Louisiana, Inc.*, Civil Action No. 14-235, 2016 WL 4445250, at * 2 (M.D. La. Aug. 19, 2016) (quoting *B-G & G Inv'rs VI, L.L.C. v. Thibaut HG Corp.*, 985 So. 2d 837, 842 (La. App. 4 Cir. 5/21/08)). Defendants seek dismissal of Plaintiffs' breach of contract claim against the Individual Defendants based on Defendants' assertion that "Plaintiffs have not alleged any facts that would support a finding of alter ego status."[62]  Because the court has found Plaintiffs failed to allege facts to support a finding that the Individual Defendants are the alter egos of PCS, the court also GRANTS

---

Brown…."); ¶ 7 ("At all relevant times herein, alter ego, Kim Roundtree, is a director of PCS.").  Arguably, as the sole shareholder of PCS, Bullock may have gained something when the offices established by Plaintiffs were sold to Seaside.  However, that is not alleged in the Amending Complaint and, as noted in n. 49, *supra*, the court will not assume a benefit on this basis alone.  Moreover, and as discussed above with respect to personal jurisdiction, Plaintiffs' allegations regarding Bullock's misrepresentations and actions are much less specific than with respect to Lewis and Roundtree.  The allegations of how Lewis and Roundtree benefited are even less specific than those regarding Bullock and, indeed, contradict the notion that Lewis and Roundtree benefited at all.  Without more detail (which this court has already once permitted Plaintiffs the opportunity to provide), Plaintiffs have not met the heightened Rule 9(b) pleading requirements for a LUTPA claim against the Individual Defendants.

[61] *See*, R. Docs. 10-4, 14-1, & 14-3.

[62] R. Doc. 33-1, p. 11.

Defendants' Motion to Dismiss Plaintiffs' breach of contract claim against the Individual Defendants.[63]

### 3.  Interference with Contract Against the Individual Defendants

Per their Amending Complaint, Plaintiffs seek to assert a cause of action for interference with contract against the Individual Defendants.[64]   Defendants reassert the argument made in support of dismissal of this claim from Plaintiffs' original complaint, wherein Defendants argued that under Louisiana law, "a tortious interference claim may lie against [the Individual Defendants] if they acted beyond the scope of their corporate authority or knowingly committed acts adverse to the interests of Primary Care Solutions."[65]

"Louisiana recognizes only a limited cause of action for intentional interference with contractual relations."  *Bollinger v. Tanner Companies, LP*, Civ. A 02-3248, 2003 WL 1824836, at * 2 (E.D. La. April 7, 2003) (citing *9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 231-234 (La. 1989)).  *See also*, *Dorsey v. Northern Life Ins. Co.*, Civ. A. 04-0342, 2005 WL 2036738, at * 17 (E.D. La. Aug. 15, 2005) ("The U.S. Fifth Circuit Court of Appeals, federal district courts in Louisiana, and various Louisiana Courts of Appeal since *9 to 5 Fashions* have 'uniformly recognized the narrowness of Louisiana's tortious interference action.'") (quoting *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 457 (5th Cir. 1999)).  As set forth by the *Spurney* court, "an officer of a corporation owes an obligation to a third

---

[63] As discussed above with respect to this court's ability to exercise personal jurisdiction over the Individual Defendants, Plaintiffs have not sufficiently asserted a basis for their position that the Individual Defendants should be considered the "alter egos" of PCS.

[64] R. Doc. 27, ¶¶ 63-65.

[65] R. Doc. 10-1, p. 15.  *See also*, R. Doc. 33-1, p. 11 ("Plaintiffs' third cause of action of their First Supplemental and Amending Complaint once again adds nothing but additional conclusory paragraphs already referenced in this pleading.  Therefore, Defendants rely completely upon the section already presented regarding interfering with contracts in its original Memorandum in Support of Motion to Dismiss.").

person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct.  The officer's action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of his corporate authority and in the reasonable belief that his action was for the benefit of the corporation."  538 So. 2d at 231.  For purposes of analysis, a cause of action for intentional interference with contract may be divided into the following elements:

> (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.

*Id*. at 234.  In their Amending Complaint, Plaintiffs allege that the Individual Defendants interfered with the contracts with PCS "by failing to allow the Donaldsonville and St. Francisville offices to grow, interfering with the establishment of the offices, not approving requests that would have resulted in growth of the offices and selling the offices to Seaside with no compensation to Tammy Cooper, Cross Over Therapy, and Kendall 'Ken' Brown."[66]  Although sparse, Plaintiffs seem to allege that the Individual Defendants intentionally rendered Plaintiffs' performance of the site director agreements more burdensome.  However, and as noted above, a plaintiff must provide more than labels and conclusions.  *See*, *Rodrigue*, 2014 WL 4986840, at * 2.  *See also*, *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995) ("'conclusory allegations or legal conclusions

---

[66] R. Doc. 27, ¶ 64.

masquerading as factual conclusions will not suffice to prevent a motion to dismiss.'") (quoting *Fernandez–Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir.1993)).  Plaintiffs here have provided no specific information regarding how the Individual Defendants interfered with the establishment of the St. Francisville or Donaldsonville offices, nor have they explained what "requests that would have resulted in growth of the offices" were not approved or how such requests if approved would have resulted in growth.  Moreover, Plaintiffs have failed to allege how such actions were taken by the Individual Defendants without justification.[67]  Accordingly, the court GRANTS Defendants' Motion to Dismiss Plaintiffs' interference with contract claim against the Individual Defendants.

### 4.  Conversion

Defendants previously sought dismissal of Plaintiffs' conversion claim in their original Motion to Dismiss.  In support of the instant Motion, Defendants rely completely on their previous briefing in support of the original Motion to Dismiss.[68]

Plaintiffs' Amending Complaint alleges that "paragraph 1.2(a) and Exhibit B of the contract between Seaside and Primary Care Solutions specifically includes the sale of all furniture and equipment in the Donaldsonville agency office that is the basis of the conversion."[69]  In the March 21, 2107 ruling, this court explained that although the alleged sale to Seaside appears to be the catalyst for both Plaintiffs' breach of contract and conversion claims, the claims as alleged are

---

[67] This is especially problematic here, where the only even arguably specific actions constituting interference with contract – not approving requests and selling to Seaside – would seem to be within the scope of the Individual Defendants' authority and Plaintiffs have not alleged that any of the Individual Defendants' actions were adverse to PCS.  *See*, *Bollinger*, 2003 WL 1824836, at * 2 ("Under *Spurney*, a tortious interference claim may lie against Woodman if she acted beyond the scope of her corporate authority or knowingly committed acts adverse to [corporation's] interests.  If she acted within the scope of her corporate authority, then the proper vehicle for relief is a breach of contract action against the corporation itself.").

[68] R. Doc. 33-1, p. 11.

[69] R. Doc. 27, ¶ 68.

separate.  Plaintiffs do not allege that their contract with PCS required them to purchase furniture

or equipment, and they do not allege that the sale of such furniture and equipment itself breached

the contract(s) between Ms. Cooper/Cross Over Therapy and PCS.  Accordingly, the court

DENIES Defendants' Motion to Dismiss Plaintiffs' cause of action for conversion against PCS.

With respect to Plaintiffs' claims of conversion against the Individual Defendants, "[i]t has

long been established in Louisiana that a corporate officer may be personally liable for conversion

on behalf of a corporation."  *United States v. Hibernia National Bank*, 882 F.2d 961, 964 (5th Cir.

1989).  However, to impose such liability, the corporate officer must have personally participated

in the act of conversion.  *Id*. at 965.  *See also*, *Aerotek, Inc. v. Revenue Cycle Management, Inc.*,

Civil Action Nos. 08-4638, 09-6998, 2012 WL 860373, at * 5 (E.D. La. March 13, 2012)

("Personal liability for a corporate officer can attach based on his participation in the corporation's

act of conversion.").  Here, Plaintiffs allege that the contract between PCS and Seaside resulted in

the alleged conversion.  Plaintiffs have not alleged more than generalized conclusory assertions

that any Individual Defendant personally participated in the alleged conversion,[70] and as discussed

above, Plaintiffs have not sufficiently alleged that any Individual Defendant is the alter ego of

---

[70] *See*, R. Doc. 27, ¶¶ 11(n) & (o) (alleging that all defendants, including the Individual Defendants, engaged in conversion of office equipment owned by and/or profits owed to Plaintiffs); 71 (alleging that "[t]he actions of PCS and its three alter egos, William Bullock, Monica Lewis, and Kim Roundtree, constitute 'conversion' of property rights" because such actions were "in derogation of…possessory rights," "were a wrongful exercise or assumption of authority over property owned by" Cooper and/or Cross Over Therapy, deprived Cooper and/or Cross Over Therapy of possession, and were an unlawful exercise of ownership).  Such generalized references to actions by all defendants are insufficient to state a claim.  *See*, *e.g.*, *Petri v. Kestrel Oil & Gas Properties, L.P.*, Civil Action Nos. 09-3994, 10-122, 10-497, 2011 WL 2181316, at * 6 (S.D. Tex. June 3, 2011) ("Plaintiffs have improperly lumped all Defendants together in the amended complaint, which is too vague and ambiguous to state a claim and is devoid of particularized and specific allegations against WGMS as to all allegations of negligence, gross negligence and/or malice."); *Howard v. ABN AMRO Mortg. Group, Inc.*, No. 1:13CV543, 2014 WL 1237317, at * 3 (S.D. Miss. March 26, 2014) (explaining that "the Fifth Circuit has provided that '[w]here the complaint is devoid of facts that would put the defendant on notice as to what conduct supports the claims, the complaint fails to satisfy the requirement of notice pleading.'  It necessarily follows that the Plaintiff's conclusory allegations against all 'defendants' fail to state a claim upon which relief can be granted as to FHLB and Wells Fargo.") (quoting *Anderson v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 525, 528 (5th Cir.2008) (citing *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 165–66 (5th Cir.1999)).

PCS.[71]  Accordingly, the court GRANTS Defendants' Motion to Dismiss Plaintiffs' cause of action for conversion against the Individual Defendants.

### 5.  Fair Labor Standards Act ("FLSA")

Pursuant to the FLSA, "[e]very employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages" at a provided minimum statutory rate.  29 U.S.C. § 206(a)(1).  Additionally, the FLSA provides that "no employer shall employ any of his employees who in any workweek…is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  29 U.S.C. § 216(b) provides, *inter alia*, that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

In their Amending Complaint, Plaintiffs allege that in the event this court determines that "the sweat equity investment was not an investment, then, plaintiffs are entitled to recover an hourly rate plus overtime for the unpaid hours of labor worked in the Donaldsonville and St. Francisville offices respectively at a rate to be established by the court for the 25 to 30 hours a

---

[71] Per the Amending Complaint, Plaintiffs allege that "[t]he actions of PCS, and its three alter egos, William Bullock, Monica Lewis, and Kim Roundtree, constitute 'conversion' of property rights of Cooper and Cross Over Therapy…." R. Doc. 27, ¶ 71.  Accordingly, it appears that Plaintiffs seek to impose liability for the alleged conversion upon the Individual Defendants based on their alleged alter ego status.

week that they spent working to build the Donaldsonville and St. Francisville offices."[72] Accordingly, although Plaintiffs reference the FLSA's overtime provisions in the Amending Complaint, it appears that Plaintiffs are actually alleging an alternative claim for hourly wages under 29 U.S.C. § 206 for the "25 to 30" hours they spent from the dates they entered into the site director agreements until the date of the Seaside agreement.

Defendants move to dismiss Plaintiffs' FLSA claims, arguing that "Plaintiffs have simply referenced a complex federal statute with virtually no factual context or support"[73] and that "[a]s a threshold issue, Plaintiffs do not allege that an employer-employee relationship existed during the unpaid periods."[74]  Defendants point out that the agreements at issue "provide that '[n]othing herein shall be construed to create an employer-employee relationship between the Company and the Contractor.  Contractor is an independent contractor and NOT an employee of the Company or any of its subsidiaries or affiliates.'"[75]  Defendants further argue that "Plaintiffs have failed to allege when they worked overtime and how much they were underpaid."[76]  The whole of Plaintiffs' Opposition is as follows:

> Paragraphs 12, 15, 16, 18, & 19 specifically states that Cooper, hired in December 2012, and Brown, hired February 9, 2012, were employees of PCS and remained employed until PCS was sold to Seaside in May 2015.  Paragraphs 4(2) gives an example of how PCS recognized Tammy Cooper as an employee and advised that if she paid the rent for September and October in the Donaldsonville

---

[72] R. Doc. 27, ¶ 74.  *See also*, R. Doc. 27, ¶ 55 (Tammy Cooper/Cross Over Therapy estimate that from the time that they signed their contracts until the time that PCS sold their offices without paying them any profits from the sale that they spent 25 to 30 hours per week developing the Donaldsonville and St. Francisville office that they were lead to believe they had a vested ownership interest in.").

[73] R. Doc. 10-1, p. 19.  In support of their instant Motion to Dismiss, Defendants "rely upon this section of the original Memorandum in Support of Motion to Dismiss and would again point out to the Court that the Plaintiffs' consulting agreements provide that there is no employer/employee relationship which is a threshold issue for a cause of action under the FLSA."  R. Doc. 33-1, p. 11.

[74] R. Doc. 10-1, p. 17.

[75] R. Doc. 10-1, p. 17.

[76] R. Doc. 10-1, p. 18.

office that she could work two extra days as an employee of PCS
and not be paid for working to pay the rent.  Further, paragraph 55
estimates that Cooper and Brown put in 25 to 30 hours per week
developing the Donaldsonville and St. Francisville office while
employed by PCS, but were not paid which is a violation of the Fair
Labor Standard Act.[77]

Paragraphs 12, 15, and 16 allege that Plaintiffs were employed by PCS at the times they were

allegedly recruited to start their own satellite offices.[78]  In contrast, Paragraphs 18 and 19 of the

Amending Complaint arguably allege that Plaintiffs continued to be employed by PCS through the

date of sale to Seaside.[79]  Plaintiffs also rely on Paragraph 4(b)(2) of the Amending Complaint,

which alleges that PCS was insolvent because, *inter alia*, Cooper was "coerc[ed]…through text

messaging on August 29, 2014 to pay the rent on the Donaldsonville office for September and

October by working two extra days as an employee of PC [sic] instead of being paid for her work."

Under the FLSA, an employer is "any person acting directly or indirectly in the interest of

an employer in relation to an employee."  29 U.S.C. § 203(d).  The "remedial purposes of the

---

[77] R. Doc. 35, p. 10.

[78] R. Doc. 27, ¶ 12 ("In an effort to disguise the scheme, PCS through its alter ego, President, William Bullock and alter ego directors, Monica Lewis and Kim Roundtree recruited two employees, Tammy Cooper and Kendall 'Ken' Brown licensed mental health professionals (LMPH [sic], sometimes hereinafter) and potential competitors offering them an opportunity to invest in Primary Cary Solutions, Inc. and start their own satellite agency offices that promised to pay 40% of the profits monthly after a $25,000.00 sweat equity investment."); ¶ 15 ("PCS through its alter ego, President, William Bullock and alter ego directors, Monica Lewis and Kim Roundtree came to Baton Rouge Louisiana in March and April 2014 and convinced Tammy Cooper an employee of PCS in the Baton Rouge through fraudulent misrepresentations discussed above to sign a sham contract that contained an invalid non-compete clauses for a period of 6 months that was not geographic specific."); ¶ 16 ("In April 2014 after the presentation meeting where the PCS franchise plan was introduce, Ken Brown was introduce by Kim Roundtree and Monica Lewis to a man known as Keil who would be moving to Louisiana to open a franchise in St. Francisville and asked Ken Brown to assist him to find a site; then later told him that Keil had changed his mind and on July 25, 2014 Kim Roundtree and Monica Lewis returned to the Baton Rouge office and told Ken Brown, a PCS employee, that because the deal with Keil had fallen through that they wanted to offer him the opportunity to start the St. Francisville office as his own and that he could either purchase the office with upfront cash or that he could obtain the franchise for the St. Francisville office through the plan to put up $25,000.00 in sweat equity.").

[79] R. Doc. 27, ¶ 18 ("In December 2012, Tammy Cooper was employed in the Baton Rouge office of Primary Care Solutions, Inc. as a Licensed Mental Health Professional (LMHP) and continued to be employed by PCS in the Baton Rouge office until PCS sold the company to Seaside in May 2015; until she built the Donaldsonville office."); ¶ 19 ("On February 9, 2012, Kendall 'Ken' Brown was employed in the Baton Rouge office of Primary Care Solutions, Inc. as a Mental Health Professional and continued to be employed by PCS in the New Roads office until PCS sold the company to Seaside in May 2015; while he built the St. Francisville office.").

FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2012) (quoting *McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curium)). "We rely on the economic reality test when determining a party's status as an employer under the FLSA." *Id*. Under this test, a court evaluates: "'whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.' However, a party need not establish each element in every case." *Id*. (citing *Gray v. Powers*, 673 F.3d 352, 354 (5th Cir. 2012). The Fifth Circuit has suggested that, in appropriate circumstances, a franchisor may "qualify as the FLSA employer for a franchisee's employees." *Id*. at 452 ("We do not suggest that franchisors can never qualify as the FLSA employer for a franchisee's employees; rather, we hold that [plaintiff] failed to produce legally sufficient evidence to satisfy the economic reality test and thus failed to prove that [defendant] was his employer under the FLSA."). Further, "[t]he contractual designation of the worker as an independent contractor is not necessarily controlling." *Thibault v. Bellsouth Telecommunications, Inc.*, 612 F.3d 843, 845-846 (5th Cir. 2010). "[T]he touchstone of 'economic reality' in analyzing a possible employee/employer relationship for purposes of the FLSA is dependency." *Mendoza v. Essential Quality Constr., Inc.*, Civil Action No. 09-6117, 691 F.Supp.2d 680, 685 (E.D. La. 2010).

Per the Amending Complaint, Plaintiffs allege that "[i]f the court determines that Tammy Cooper (Cross Over Therapy) and Kendall 'Ken' Brown are not entitled to recover under any of the Causes of Actions outlined in Causes 1-5 above or that the sweat equity investments was [sic] not an investment, then, plaintiffs are entitled in the alternative to recover an hourly rate for the unpaid hours of labor worked in the Donaldsonville and St. Francisville offices respectively at a

rate to be established by the court for the 25 to 30 hours a week that they spent working to build the Donaldsonville and St. Francisville offices."[80]  While Plaintiffs allege that they were both employed by PCS,[81] their allegations generally indicate they worked relatively independently.  For example, Plaintiffs allege that Cooper paid for rent and utilities using personal checks to be subsequently reimbursed by PCS,[82] and that both Plaintiffs "scheduled their own appointments."[83] However, the Amending Complaint also alleges some level of supervision and control over Plaintiffs.  With respect to Brown, Plaintiffs allege that although Brown believed he would have authority to establish the St. Francisville office as his own, "PCS maintained control over the office and he had to get permission to make purchases such as desk, computer, phones, fax machine, and furniture."[84]  With respect to Cooper, Plaintiffs allege that she was instructed to write personal checks to PCS to cover rent and utilities, and that PCS in turn made payments for such rent and utilities to the landlord.[85]  In light of the remedial purpose of the FLSA and Plaintiffs' (albeit weak) allegations of PCS's supervision and control, the court finds that the Amending Complaint has set forth a plausible basis, at least at this stage of these proceedings, to allege an employee/employer relationship between Plaintiffs on the one hand and PCS on the other.  Accordingly, the court DENIES Defendants' Motion to Dismiss Plaintiffs' cause of action for violations of the FLSA

---

[80] R. Doc. 27, ¶ 74.

[81] R. Doc. 27, ¶¶ 18 & 19.

[82] R. Doc. 27, ¶¶ 11(d)-(f).  Plaintiffs allege that Roundtree directed Cooper to pay for certain expenses via personal check that would be subsequently reimbursed by PCS.  R. Doc. 27, ¶ 4(b)(1).  While such reimbursement may reinforce a conclusion that PCS exerted some level of control over Cooper, it does not indicate such control by Roundtree.

[83] R. Doc. 27, ¶ 11(j)(ii).

[84] R. Doc. 27, ¶ 11(b).  In the context of Plaintiffs' interference with contract cause of action, Plaintiffs allege that the Individual Defendants interfered with their contracts with PCS by "not approving requests that would have resulted in growth of the offices."  R. Doc. 27, ¶ 64.  The court finds such vague allegation insufficient to support the level of control necessary to constitute an employer relationship under the FLSA.

[85] R. Doc. 27, ¶ 4(b)(1).

against PCS.   However, because Plaintiffs have not alleged a sufficient level of control or supervision by any of the Individual Defendants, the court GRANTS Defendants' Motion to Dismiss Plaintiffs' cause of action for violations of the FLSA against the Individual Defendants.

### 6. Unjust Enrichment

Article 2298 of the Louisiana Civil Code provides that "[a] person who has been enriched without cause at the expense of another person is bound to compensate that person.   The term 'without cause' is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law.   The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule."   "The unjust enrichment remedy is 'only available to fill a gap in the law where no express remedy is provided.'" *Walters v. MedSouth Record Management, LLC*, 38 So. 3d 241, 242 (La. 2010).   *See also*, *Carriere v. Bank of Louisiana*, 702 So. 2d 648, 672 (La. 1996) ("The existence of a 'remedy' which precludes application of unjust enrichment does not connote the ability to recoup your impoverishment….It merely connotes the ability to bring the action or seek the remedy."); *AMEC Construction Management, Inc. v. Fireman's Fund Ins. Co.*, Civil Action No. 13-718, 2014 WL 5465810, at * 3 (M.D. La. Oct. 28, 2014) ("Unjust enrichment is an available remedy only when a gap in the law exists that prevents a plaintiff from pursuing a remedy for their alleged injury.").

Since Plaintiffs have alleged a breach of contract claim, it would appear that Plaintiffs are barred from also pleading unjust enrichment.   However, this court has taken the position that "the liberality of Federal Rule of Civil Procedure 8 allows for pleading in the alternative even if the pleadings are inconsistent."   *AMEC Construction Management, Inc. v. Fireman's Fund Ins. Co.*, Civil Action No. 13-718, 2014 WL 5465810, at * 3 (M.D. La. Oct. 28, 2014) (explaining that "[s]ince ACMI has alleged various other claims in its complaint, it would appear that ACMI may

be barred from pleading unjust enrichment" but ultimately denying defendants' motion to dismiss plaintiff's unjust enrichment claim based on Fed. R. Civ. P. 8 and noting that "ACMI is allowed to plead unjust enrichment in the alternative."). As this court has previously explained, "[t]his Court has rejected the 'blanket proposition that no plaintiff may ever plead an unjust enrichment claim alongside a claim which would grant a remedy at law.' This Court has held that the law does not compel 'an election of remedies between a contractual theory and an unjust enrichment theory prior to filing a complaint.'" *U.S. ex rel. Sun Coast Contracting Services, LLC v. DQSI, LLC*, Civil Action No. 13-297, 2014 WL 7246936, at * 5 (M.D. La. Dec. 17, 2014) (quoting *Property One, Inc. v. USAgencies, LLC*, Civil Action No. 11-453, 830 F.Supp.2d 170, 181 (M.D. La. 2011) & citing *Cent. Facilities Operating Co. v. Cinemark USA, Inc.*, Civil Action No. 11-660, 2014 WL 3866086, at * 5 (M.D. La. Aug. 6, 2014)). *See also*, *Property One, Inc. v. USAgencies, LLC*, 830 F.Supp.2d at 181 ("Nothing in [*Carrier v. Bank of La.*, 702 So. 2d 648 (La. 1996)] compels an election of remedies between a contractual theory and an unjust enrichment theory prior to filing a complaint."); *Hall v. Habul*, Civil Action No. 13-406, 2014 WL 2441177, at * 5 (M.D. La. May 30, 2014) (denying defendant's motion to dismiss plaintiff's unjust enrichment claim and explaining that "[a]lthough the Court is aware that several federal district courts in Louisiana have ruled on both sides of this issue, under the facts of this case, the Court does not find that dismissal of Plaintiff's alternative claim of unjust enrichment is appropriate at this time.").

Although this court has allowed such alternative pleading, by the plain terms of Article 2298 of the Louisiana Civil Code such cause of action may only be asserted against "[a] person who has been enriched without cause…." *See also*, *Property One, Inc. v. USAgencies, LLC*, Civil Action No. 11-453, 830 F.Supp.2d 170, 175 (M.D. La. Nov. 15, 2011) (explaining the five

prerequisites of a claim for unjust enrichment and that first, "there must be an enrichment *of the defendant*….") (emphasis added). As discussed herein, Plaintiffs have not sufficiently alleged any Individual Defendant should be considered the alter ego of PCS, nor have Plaintiffs alleged sufficient facts to establish that any Individual Defendant was enriched. Accordingly, although the court finds Plaintiffs alternative cause of action for unjust enrichment may be asserted against PCS, there is no basis for such a claim against the Individual Defendants. Accordingly, Defendants' Motion to Dismiss Plaintiffs' cause of action for unjust enrichment against PCS is DENIED. Defendants' Motion to Dismiss Plaintiffs' cause of action for unjust enrichment against the Individual Defendants is GRANTED.

### C.  Leave to Amend the Complaint

In this court's March 21, 2017 Ruling, Plaintiffs were granted leave to amend their substantive allegations to address the discussed deficiencies.[86] On April 11, 2017, Plaintiffs filed their Amending Complaint.[87] In response to the instant Motion to Dismiss, Plaintiffs have not sought leave to amend their Amending Complaint and instead rely on the sufficiency of their allegations as set forth in the Amending Complaint.

"Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so." *Hart v/ Bayer Corp.*, 199 F.3d 239, 247 (5th Cir. 2000) (citing *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 675–76 (2d Cir. 1991)). Moreover, "[i]n view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often

---

[86] R. Doc. 26, p. 38.

[87] R. Doc. 27.

afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). The decision to allow amendment of a party's pleadings is within the sound discretion of the district court. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Norman v. Apache Corp.*, 19 F.3d 1017, 1021 (5th Cir. 1994) (citation omitted).

In determining whether to allow an amendment of the pleadings, a court considers the following: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman*, 371 U.S. at 182; *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 566 (5th Cir. 2003) (citation omitted). Here, the court has previously allowed Plaintiffs an opportunity to amend their pleading, and to the extent the instant ruling dismisses certain of Plaintiffs' claims, the court finds that allowing additional amendment here would be futile.

## III.   Conclusion

For the reasons set forth herein, the court GRANTS IN PART AND DENIES IN PART the Motion to Dismiss Under FRCP 12(b)(2) and 12(b)(6).[88]

The Individual Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is DENIED.

Defendants' Motion to Dismiss Plaintiffs' LUTPA claim, FLSA claim, conversion claim, and claim for unjust enrichment against PCS is DENIED.

---

[88] R. Doc. 33.

Defendants' Motion to Dismiss Plaintiffs' LUTPA claim, breach of contract claim, interference with contract claim, conversion claim, FLSA claim, and claim for unjust enrichment against the Individual Defendants is GRANTED.[89]  IT IS HEREBY ORDERED that Plaintiffs' claims for violation of LUTPA, breach of contract, interference with contract, conversion, violation of the FLSA, and unjust enrichment against the Individual Defendants are DISMISSED.

Signed in Baton Rouge, Louisiana, on October 11, 2017.


**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[89] Defendants did not seek dismissal of Plaintiffs' cause of action for breach of contract against PCS, and that remains a live claim in this suit.